

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00310-CV

_____

JOSEPH E. EASON III AND CATHERINE WEIL, Appellants

V.

DEERING CONSTRUCTION, INC. D/B/A DK CONSTRUCTION, Appellee

On Appeal from County Court at Law No. 3
Tarrant County, Texas
Trial Court No. 2017-002610-3

Before Gabriel, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

Appellants Joseph "Trey" Eason III and Catherine Weil[1] appeal the trial court's judgment awarding appellee Deering Construction $9,449.74 in damages and $30,000 in attorney's fees. Because the evidence is factually insufficient to support the amount of damages awarded, we suggest a remittitur of $2,734.74. And because we hold the evidence is factually insufficient to uphold the attorney's fees award, we reverse that portion of the judgment and remand the fee issue to the trial court for reconsideration in light of *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469 (Tex. 2019).

## I. BACKGROUND FACTS

### A. THE PARTIES' AGREEMENT

In February 2016, Trey contacted Brad Deering,[2] a general contractor specializing in residential renovations, to inquire about a possible kitchen renovation in the Easons's 1930s Tudor-style home. Deering met with Trey at the house, where Trey showed him a basic drawing of what the Easons wanted, including vaulted ceilings and new appliances, fixtures, countertops, and flooring. After two more walk-

---

[1]For simplicity and in accordance with their own brief, we will refer to the appellants collectively as the Easons.

[2]Deering's company is Deering Construction, Inc. d/b/a DK Construction, the named appellee. We will refer to Brad Deering and his company collectively as Deering.

throughs, Deering put together a proposal estimating an overall cost of $112,610.04, including 18% for his overhead and profit.

The Easons hired Deering to perform the work, but when the project costs exceeded the original proposal, it became clear that they and Deering disagreed about the character of their agreement. While the Easons viewed it as a fixed-price agreement, with Deering agreeing to cover any overages beyond the initial quote of $112,610.04, Deering adamantly denied ever making such a promise and characterized their agreement as a cost-plus arrangement. In fact, Deering testified that in over 20 years of business he had never entered into a fixed-price contract for a project and described how doing so would be nearly impossible as there were too many unknowns—the Easons had not selected finishings and fixtures and Deering could not predict what additional work may be needed due to the age of the house. Deering denied ever telling the Easons that $112,610.04 would be the maximum cost.

### B. PROBLEMS AND OVERAGES

Deering began work in October 2016. Soon after Deering began working on the home, he discovered some of the problems that are typical in older homes, including termite damage, structural issues, and plumbing problems, which required additional costs to repair. And, according to Deering, the Easons chose fixtures that resulted in additional expenses beyond the planned allowances.

### 1. Flooring and Ceilings

Over the years, past owners had laid multiple layers of flooring over the original hardwood floors. Those layers had to be removed and, once gone, it was clear that the hardwood was unsalvageable, so it had to be removed and replaced. Though the cost to replace the hardwood floors came in under budget, replacing the damaged subfloor beneath it incurred additional costs that were not included in the original proposal.

Deering also found structural problems in the ceiling, caused by termite damage and poor past-renovation work. The ceiling was sagging because a wall had been removed but a proper header had not been installed. Deering testified that they had not known about it until they began work because it was not visible from below. Repairing the damaged floors and ceiling incurred an additional $1,800 cost beyond the original proposal.

### 2. Painting

Painting and trim work also cost more than expected—originally budgeted at $7,800, the final cost was $11,658. Deering alleged that Trey instructed the painter to strip the paint on the doors to the bedroom and hallway—tasks that were not included in the original proposal—and that the painter stripped cabinets that he should not have, causing extra work. When it came to trim work, Deering alleged that the Easons asked for items outside the original scope of work, including "modifying

the pantry door [and] install[ing] glass in it." Trey denied requesting any additional painting or trim work.

When Deering invoiced the Easons for the painting and trim work, he only charged them $7,800 but noted on the invoice: "Actual invoice amount was $11,658.00, will reconcile at end of project." He explained at trial that he had hoped that shortages in other areas of the project would cover that additional expense.

### 3. Countertops and Tiling

Deering also averred that some of the Easons's choices for materials and fixtures exceeded the originally planned allowances. Deering had allowed $7,380 for countertops, including labor and installation, but the Easons's choices exceeded that amount in the materials cost alone. Trey even admitted at trial that their countertop choices exceeded the allowance without accounting for labor and installation.

Similarly, the Easons chose tiles that had to be individually cut and laid, causing five more days of labor to install than initially expected. Deering testified that the original allowance for tile-installation labor was $400 but the end cost was $1,440. Trey testified that Deering never indicated that the installation would be more costly.

### 4. Appliances

The appliances also cost more than originally expected, and Deering averred that Trey approved the appliance invoices before they were ordered. Whereas the

5

proposal provided $10,711.24, the appliances actually cost $13,611.23.[3] The Easons argued that they paid these costs in response to two invoices by Deering charging $12,024.70 and $1,421.28 for appliance costs.

### 5. Design Work

Deering testified that design work for drawing cabinet and pantry plans cost $2,475.00 and was not billed at the time it was completed in November. He also averred that the Easons approved the design work.

### C. DEERING'S OFFER TO FOREGO PROFIT

In early December, when the Easons raised concerns about staying on budget, Deering offered to stop billing his overhead and profit—an offer the Easons accepted. Deering testified that the Easons never mentioned not paying for overages, but instead paid every invoice up until the "very end of the project." In all, the Easons paid Deering $113,722.

### D. THE EASONS'S REFUSAL TO PAY FOR OVERAGES

After the work was finished, Deering met with the Easons in early February 2017 to discuss two unpaid invoices—invoices 4899 and 4830. Invoice 4899 listed all of the unpaid costs and overages for the project as follows:

---

[3]Deering had accidently neglected to include the refrigerator in the original proposal, estimating only $8,211.24 for appliance costs. In November, Deering revised the original proposal to include a refrigerator, raising the estimated appliance cost to $10,711.24 and the estimated overall cost to $115,560.04.

| | |
|---|---|
| Draw on additional plumbing labor & materials as per Hargis Plumbing proposal: | $1,744.58 |
| Draw on appliance cost overrun as per Texas Appliance quote: | $2,734.74 |
| Draw on additional framing labor for removing additional layer of flooring, repairing termite damage and reworking ceiling joist in breakfast area: | $1,800.00 |
| Draw on design work for drawing cabinet and pantry plans: | $2,475.00 |
| Draw on additional painting labor & materials for stripping doors, windows & existing cabinets: | $1,440.00 |
| Draw on additional labor and materials for installing wainscoting and installing diamond tile not on original proposal: | $1,000.00 |
| Total | $11,194.32 |

Invoice 4830 listed Deering's 18% overhead and profit that he had incurred but not billed the Easons for after their December agreement; it totaled $14,770. Deering offered to forgive the $14,770 if the Easons paid the $11,194, but the Easons declined his offer.

### E. THE SUIT AND THE TRIAL COURT'S JUDGMENT

Deering subsequently filed suit against the Easons, alleging claims for breach of contract and quantum meruit. At trial, he asked the court to award him $25,671.82, but the trial court made clear that it believed Deering had waived any recovery of the 18% overhead and profit incurred after the December agreement and reflected in invoice 4830.[4]

---

[4]Deering does not appeal this finding.

The trial court found in favor of Deering and awarded $9,449.74 in damages and $30,000 in attorney's fees, as well as conditional appellate fees. In a hearing on the Easons's motion for new trial, the trial court admitted that it had declined to award the plumbing overages claimed on Invoice 4899,[5] thus reaching the $9,449.74 sum. It also issued findings of fact and conclusions of law, including the following:

- The parties verbally agreed to a "cost-plus" arrangement in which Deering would perform all work requested based on his cost plus 18 percent for overhead and profit.

- Deering invoiced the Easons for work performed based on his costs incurred and, initially, he included his eighteen percent overhead and profit in the invoices but later offered to forgo that overhead and profit.

- In total, Deering invoiced $132,278.76, of which the Easons paid $113,722.93.

- $9,373 in overhead and profit was not billed.

- The total amount due to Deering was $9,449.74.

- The Easons breached the verbal contract with Deering and therefore owed him $9,449.74.

- Alternatively, Deering was entitled to recover $9,449.74 in quantum meruit because he performed valuable services for the Easons and the Easons knew or reasonably should have known Deering expected to be paid for those services.

This appeal followed.

## II. DISCUSSION

The Easons bring six points on appeal, which can be categorized as contesting (1) the sufficiency of the evidence to support Deering's recovery on his breach-of-

_____

[5]Deering does not appeal this finding.

8

contract claim; (2) Deering's alternative recovery based on quantum meruit; and (3) Deering's recovery of $30,000 in attorney's fees.

## A. BREACH OF CONTRACT

The Easons's first two points argue that the evidence is legally and factually insufficient (1) to support the trial court's conclusion that they breached their contract with Deering and (2) to support the award of damages.

### 1. Standard of Review

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and, when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields*

9

*v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## 2. Analysis

The Easons object to the trial court's findings that the parties agreed to a cost-plus arrangement, that they breached that agreement, and that they owe Deering $9,449.74. We disagree with the Easons's assertion that they did not enter into and

10

subsequently breach a cost-plus arrangement, but we agree with them in part as to the amount of damages supported by the evidence.

### a. Existence of a Cost-Plus Agreement

Deering testified that he has never, in over 20 years of business, entered into a fixed-price contract and that he did not do so in this case. He described how doing so would be, in his view, impossible because of the unknowns of home renovations, particularly of an older home such as the Easons's 1930s Tudor. He explained his use of allowances to estimate the costs for such unknowns, including the Easons's eventual fixture choices. And he explained that the Easons made changes along the way that incurred additional costs and that they approved those additional costs. Finally, Deering denied ever promising the Easons that the proposal price was firm or that he would cover any overages.

This evidence is legally sufficient to support the trial court's finding that the parties entered into a cost-plus agreement. It is also factually sufficient. The determination essentially boiled down to a fact dispute between Deering and the Easons regarding the nature of their agreement, and the trial court was in the best position to judge their credibility and to conclude that they did not enter into a fixed-price contract. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We therefore overrule the Easons's complaints of the sufficiency of the

11

evidence supporting the trial court's finding that they entered into a cost-plus agreement with Deering.[6]

### b. The Easons's Breach of the Cost-Plus Agreement and Damages

Having held that the trial court did not err by finding that the parties entered into a cost-plus agreement, we now turn to the Easons's interrelated arguments that (1) they did not breach the agreement because they either paid the amounts sought from them in Invoice 4899 or those amounts were not part of their agreement with Deering, and (2) that the $9,449.74 damage award is not supported by sufficient evidence.

The trial court's award of $9,449.74 corresponded to Deering's requests in invoice 4899 for: (1) $2,734.74 in appliance overruns; (2) $1,800 in additional framing labor for flooring, termite damage, and ceiling repairs; (3) $2,475 in design work for cabinet and pantry plans; (4) $1,440 in additional painting labor and materials; and (5) $1,000 for additional trim and tile work. The Easons's arguments pick apart those numbers as either already having been billed in prior invoices or as being outside the scope of their agreement. In response, Deering essentially argues that it incurred significantly more in costs than the Easons have been ordered to pay. Both parties are right in some respects and wrong in others.

---

[6]In light of this holding, we need not address the Easons' third and fourth points, contesting Deering's alternative recovery under quantum meruit. *See Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988); *City of Fort Worth v. Gene Hill Equip. Co., Inc.*, 761 S.W.2d 816, 821 (Tex. App.—Fort Worth 1988, no writ).

In a cost-plus arrangement, one party undertakes to pay all costs incurred by the other party in the performance of his contractual duties, plus a fixed fee over and above such reimbursable services. *See Sage St. Assocs. v. Northdale Const. Co.*, 863 S.W.2d 438, 442 (Tex. 1993); *Gay v. Stratton*, 559 S.W.2d 131, 132 (Tex. App.— Texarkana 1977, writ ref'd n.r.e.). In suing on a cost-plus contract, the plaintiff's burden is to prove the contract, the breach, and the total reimbursable costs. *Sage St. Assocs.*, 863 S.W.2d at 442. Deering's assertion that it incurred over $130,000 and so was entitled to the $9,449.74 awarded by the trial court is not, by itself, enough to meet the burden to establish its reimbursable costs, particularly in light of its agreement to waive any overhead and profit incurred after early December.

Deering invoiced the Easons weekly, accompanied with any applicable bills or other documentation to support the charges listed on the invoices. There is no dispute that the Easons paid all of the invoices other than invoices 4830 and 4899. As it underlies the trial court's award, we will only examine invoice 4899.

We first turn to those items on the invoice that are supported by legally and factually sufficient evidence: the charges for additional labor related to the floors and ceilings, the design-plan work, the additional painting labor and materials, and the additional wainscoting and tilework.

### (1.) Flooring and ceiling work

Invoice 4899 requested payment of $1,800 for "Draw on additional framing labor for removing additional layer of flooring, repairing termite damage and

13

reworking ceiling joist in breakfast area." Deering explained in some detail at trial the unexpected costs that arose in repairing extensive termite damage to the floors, subfloors, and ceilings, as well as the additional labor required to remove multiple layers of flooring that had been laid over the years. In particular, replacing the damaged subfloor added additional costs not included in the original proposal. This was also reflected in presuit correspondence between the parties in which Deering explained that they had to remove pine flooring in the kitchen that did not match oak flooring elsewhere in the home and that the breakfast area floors were "in such bad shape" they had to remove and replace them; he also reminded Trey that though he had "allowed for the flooring to be installed, sanded[,] and finished[, he] did not allow for labor to remove them." Opening the ceilings also revealed that in a past renovation, the ceiling had not been properly framed and required the installation of a proper header to remedy sagging.

To rebut Deering's testimony that repairing this damage cost an additional $1,800, the Easons argued that they had paid all costs related to any additional labor in connection with the flooring, termite damage, or ceilings prior to the issuance of invoice 4899. But Deering explained at trial that the $1,800 was the unpaid overage, in addition to those costs which had already been paid in connection with the flooring and ceiling repairs.

14

As the factfinder, it was the trial court's role to weigh Deering's credibility regarding this overage in light of his testimony to the unexpected repairs. The evidence is legally and factually sufficient to support the trial court's determination.

### (2.) Design work

Next we turn to Deering's charge of $2,475 in design work for the cabinet and pantry plans. Deering testified that this work was not charged at the time it was completed in November—prior to his agreement to forego his overhead (which included design work) and profit—and that the Easons approved the design work. In fact, there is correspondence included in the record between the parties in which Trey asked about the cabinet and pantry plans and requested certain changes and considerations. The Easons refute any agreement to the design work and argue that the work was never included in any proposal. Again, it was the trial court's role as the factfinder to weigh the parties' credibility and it was entitled to believe Deering's testimony that the Easons agreed to this overhead cost prior to Deering's December agreement to forego his overhead costs; we will not disturb its determination and hold the evidence legally and factually sufficient to support this cost.

### (3.) Painting

Deering explained that the painting labor and materials cost $1,440 over the amount paid by the Easons, and attributed this overage to Trey's direction to the painters to strip and paint the doors to the bedroom and hallway, additional tasks not included in the original scope of work. Though Trey denied making any such request,

it was again within the trial court's province to settle this factual dispute based on its determination of the parties' credibilities. With Deering's testimony and the invoice on which Deering only billed the Easons $7,800 for painting and trimwork but noted, "Actual invoice amount was $11,658.00, will reconcile at end of project," the evidence is sufficient to support Deering's recovery of this cost.

### (4.) Trimwork and Tiling

Finally, invoice 4899 seeks payment for $1,000 for "installing wainscoting and installing diamond tile not on original proposal." Deering testified that the Easons requested wainscoting that was not part of the original proposal; this is also reflected in presuit correspondence between the parties in which Deering stated, "I did not initially know about the wainscot . . . ." Additionally, Deering explained that the Easons requested additional trimwork by asking for glass in the pantry doors.

He also testified that their choice of individual, diamond-shaped tiles, which had to be individually cut and laid, added a $1,000 cost beyond the original allowance for tilework. The Easons's argument focuses only on this tilework, arguing that the only invoice in the record was for $1,000, which they paid (and their payment is not disputed by Deering). But the Easons offer no argument for Deering's assertion that their choices to add wainscoting and to modify the pantry door also added to the project cost, nor have we seen any contradiction of those facts in the record. We therefore cannot disturb the trial court's determination and hold that the $1,000 charge is supported by sufficient evidence.

16

## (5.) Appliances

While the evidence is sufficient to uphold four of the five line items awarded to Deering, we cannot say the same for the claimed $2,734.74 appliance-cost overage. There are two invoices from Texas Appliance included in the record: one for $12,024.70 and one for $1,421.28  Both invoices are labeled with Texas Appliance invoice number 04118571.  The $12,024.70 invoice lists an Electrolux beverage center, an AGA range, and a large french-door refrigerator.  The $1,421.28 invoice lists a vent-a-hood.  Correspondingly, a January 19, 2017 invoice from Deering lists a $12,024.70 charge for "Draw on Electrolux bev center, AGA 44" dual range & lrg French door refridgerator as per Texas Appliance, inv. #041185711."  A second Deering invoice, issued February 2, listed a $1,421.28 charge for "Draw on VAH Vent-A-Hood 46" Liner as per Texas Appliance, inv. #04118571."  Deering admitted that the Easons paid both of those Deering invoices, but provided no explanation for the claimed $2,734.74 appliance overage listed on invoice 4899.

Without any such explanation and even viewing the evidence in Deering's favor, the claimed Texas Appliance overage is not supported by the evidence, and therefore the $9,449.74 damage award is not supported by factually sufficient evidence.

## c. Remittitur is the proper remedy

Having held that the overall award of $9,449.74 is not supported by factually sufficient evidence, we must now determine the proper remedy.  The Easons ask us to

17

reverse and render a take-nothing judgment, but that is not the proper remedy where there is evidence to support some, but not all, of the damages awarded. *See Garza v. Cantu*, 431 S.W.3d 96, 106–07 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Nor is Deering entitled to any portion of the award that the evidence does not support. *See id.*

This leaves us with the options of granting a remittitur or remanding for a new trial. *See Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007). Because we can easily determine the amount of remittitur here—by simply deleting the unsubstantiated appliance overage from the award—we choose that route and suggest a remittitur of $2,734.74 for the amount of damages awarded. If, within fifteen days of the date of this opinion, Deering files a remittitur of $2,734.74, then our subsequent judgment will reform the trial court's judgment in accordance with the remittitur and, as reformed, affirm that judgment. *See* Tex. R. App. P. 46.3, 46.5. Unless a voluntary remittitur is timely filed, we will reverse the trial court's judgment and remand the case to the trial court for a new trial on the issues of liability and damages. *See* Tex. R. App. P. 44.1(b); *Willis v. Donnelly*, 199 S.W.3d 262, 276 & n.27 (Tex. 2006).

## B. ATTORNEY'S FEES

The Easons's final two points take aim at the $30,000 fee award to Deering. First they argue that the award is precluded by the excessive-demand doctrine; second, they assert that the award is not supported by sufficient evidence. We will address each in turn.

## 1. Excessive Demand

The excessive-demand rule precludes a creditor from recovering its attorney's fees if it made an excessive presuit demand upon the debtor. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981). The dispositive inquiry is not whether the amount awarded at trial is less than that demanded; rather, the focus is upon whether the claimant acted unreasonably or in bad faith. *Hernandez v. Lautensack*, 201 S.W.3d 771, 777 (Tex. App.—Fort Worth 2006, pet. denied). Application of this rule is limited to situations where the creditor refuses a tender of the amount actually due or indicates clearly to the debtor that such a tender would be refused. *Findlay*, 611 S.W.2d at 58.

The Easons argue that Deering demanded $25,671.82—the sum of invoices 4830 and 4899—but that he later acknowledged at trial that he never intended to collect on invoice 4830, which reflected the $14,770 in overhead and profit Deering incurred after early December. But Deering testified at trial that at the parties' early February meeting, he presented both invoices and only requested payment of invoice 4830, the $11,194.32 claimed overages, and agreed to waive his recovery of the $14,770 in overhead and profit.[7] We have upheld Deering's recovery of $6,715, and we disagree with the Easons's allegations that Deering acted in bad faith by making an excessive demand. We therefore overrule their fifth point.

---

[7]Deering also testified that this offer was reflected in a letter from his attorney to the Easons.

## 2. Evidentiary Sufficiency

In their sixth and final point, the Easons argue that there is legally and factually insufficient evidence to support the $30,000 attorney's fee award to Deering.

Deering's trial attorney testified to his education and more than twenty years' of practice, his civil-trial-law board certification, and his practice in the metroplex area. He further testified to his familiarity with fees charged by similarly situated attorneys and to his hourly rate, as well as to the rates and qualifications of his associates. He explained that Deering was charged for work performed on an hourly basis and his opinion that the fees charged were reasonable and necessary to litigate Deering's claims. He further described:

> In this case we have charged approximately $38,650 through this trial, which includes my estimate of the length of this trial and an additional five hours of time spent on post-trial motions before there is a judgment signed. I believe that that is a reasonable rate for necessary work that's been performed.
>
> . . . .
>
> That includes approximately 142 hours of time.
>
> . . . .
>
> We keep contemporaneous time records of our time and all of that work included everything that we have done, including preparation of the motions, pleadings, objections, claims, correspondence for the client, correspondence for the Court, correspondence for opposing counsel, legal research, discovery, we took the depositions of two witnesses, and other issues that required time from the attorney.

20

The Easons argue that this testimony was not enough to meet the standards as recently clarified by the Supreme Court in *Rohrmoos Venture*, 578 S.W.3d 469. We agree. *Rohrmoos* built upon the Supreme Court's fee-award caselaw establishing that the starting point for calculating an award is determining the reasonable hours worked multiplied by a reasonable hourly rate. *Id.* at 498 (citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012)). The fee claimant bears the burden of providing, at a minimum, "evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.*

While Deering's counsel testified to the aggregate amount of fees and the general tasks carried out by himself and his two associates, this sort of evidence has been held to be insufficient. In *Rohrmoos*, for example, the fee-seeking party testified generally to his and his staff's review of "'millions' of emails and reviewing 'hundreds of thousands' of papers in discovery, more than forty depositions taken, and a forty-page motion for summary judgment," but the Supreme Court held this was "too general to establish that the requested fees were reasonable and necessary. Without detail about the work done, how much time was spent on the tasks, and how he arrived at the $800,000 sum, Howard's testimony lacks the substance required to uphold a fee award." *Id.* at 505. *See also Sloane v. Godberg B'Nai B'Rith Towers*, 577 S.W.3d 608, 621 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (reversing fee

award where attorney "conceded that he had not allocated hours spent on particular tasks" and supporting invoices did not break down tasks by time spent).

In response, Deering argues that *Rohrmoos* is not applicable here because this case was tried before the *Rohrmoos* decision was handed down. But Deering provides no authority for its argument, and the proper remedy in this situation is to remand the issue for a redetermination of fees. *See Barnett v. Schiro*, 579 S.W.3d 73, 74 (Tex. 2019) (remanding for reconsideration of fee award following the court's clarification in *Rohrmoos* of existing caselaw); *Estate of Stokes*, No. 02-18-00234-CV, 2019 WL 4048863, at *2 (Tex. App.—Fort Worth Aug. 28, 2019, no pet.) ("Because this recent supreme court authority has materially affected and provided guidance to central questions in the underlying trial for attorney's fees here, we reverse the judgment and remand the case for another trial to determine an appropriate award [of fees]."). *See also*, *Sloane*, 577 S.W.3d at 622 ("The proper remedy in cases where the evidence fails to satisfy the standards for determining fees . . . is to remand the issue for a redetermination of fees.").

We therefore sustain the Easons's sixth point.

### III. CONCLUSION

Having sustained the Easons's second point, we suggest that Deering remit $2,734.74, representing that portion of the judgment awarding Deering damages for appliance overages. If remittitur is filed within fifteen days of this date, we shall affirm the judgment as modified to reflect the proper amount of damages. If

22

remittitur is not filed within fifteen days, we shall reverse and remand for new trial on the issues of liability and damages.

Having sustained the Easons's sixth point, and regardless of Deering's decision whether to remit, we reverse the trial court's judgment as to attorney's fees and remand that portion of its decision for a new trial.

We overrule the remainder of the Easons's arguments.

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  December 3, 2020